The first case for argument this morning is 24-1956 Slingshot Printing v. Canon. Mr. Hashem, did I pronounce that correctly? Yes. Please proceed. Thank you. Thank you. It may please the Court. The Board's finding that Torgeson teaches connecting logic circuits to power transistors through a polysilicon conductor cannot be sustained. The only expressed disclosure in Torgeson of polysilicon is GateFingers 91. That's part of the transistor itself. Using polysilicon inside a transistor for the gate was conventional, but the invention is using a polysilicon conductor instead of conventional metal wiring to connect the transistor to the logic gates. Now, Canon admits that the GateFingers 91 themselves don't extend to the logic circuits. That's very clear from Figure 5. If the Court would—Figure 6—if the Court would please turn to Appendix 611 in the white volume. This is Figure 6 from Torgeson. I'm going to hold it kind of in a portrait view and point to things near the bottom. But this image shows—it's a zoomed-out view of Figure 9, which the Board relied on. And it shows 10 copies of Torgeson's drop generator circuit. And I'm going to look at the two copies at the bottom. They're all the same circuit. But on the right-hand side, you've got the little square labeled 35. That's the logic circuit. And then in the middle, this area with the stripes, you have the active areas of the FETs, the transistors themselves. And Column 8 of Torgeson very clearly says that in this area with the stripes, there are SourceFingers 99, DrainFingers 89, and PolysiliconGateFingers 91. Additionally, in Column 8, it's very clear that all of these fingers have, quote, the same extent. That's Column 8, Line 5. So none of the fingers, the PolysiliconGateFingers, don't extend outside this area with the other fingers. Well, what about—the Board focused on Figure 9, correct? Yes. So Figure 9 is just a zoomed-in view of Figure 6. But the important difference is, if you look for a moment still at Figure 6, at the very bottom, this dashed outline, which the Board found very important, here it's labeled 85. It's not labeled in Figure 9, but here it's very clearly labeled 85. And if you look at the corresponding description— Which line are you talking about? This is Appendix 611. At the very bottom, there's 10 sets of these dashed rectangles. On 611 are the lines? Yes, 611, and then there's the dashed rectangles right in the middle, labeled 85. The label is kind of right at the bottom of the image. Where the fingers split? Yes. There's the— Is 85 the whole line of boxes to the right there? I think 85 is pointing to this whole dashed outline, and the corresponding text says that 85 is the field effect transistor. It's the whole transistor. So there's a part with the fingers, which is the active area, Torgerson explains, and then there is this other part, which is the rest of the transistor. And if you look at Figure 9, which the board relied on, you see the same area with the fingers, and you see this dashed outline. And the board thought that the only indicator in Figure 6 on Appendix 612 that there's any polysilicon in Figure 6 is the labels 91, which are the polysilicon gate fingers. The dashed outline, as we know from the previous figure, is the transistor itself. And there's lots of things in the transistor. If you look at the top of Column 3 of Torgerson, it actually lists and enumerates all of the layers of the transistor. There's a dioxide layer, there's the polysilicon fingers, and then there's a resistor layer, a dielectric layer, but it doesn't say any polysilicon layer. Okay, but I guess I'm a little confused because the figures that I focused and I think the board focused on predominantly were Figure 9 and then also Figure 7. And Figure 7 has the 85 here and the 35, right? Yes. So Figure 7 is showing an electrical figure, and I'm glad Your Honor looked at this figure. So Figure 7 at the bottom, so this is a transistor, right? So you've got a source and drain. Those are the part on the left and the right. And then the wire coming up from 35 at the bottom is the gate. And when the logic circuit decides that we're going to fire a little droplet of ink, it's going to turn on the gate, and that's going to cause current to flow horizontally from the source to the drain and then fire off the resistor. And 35 is an electrical diagram. It shows electrical interconnections. It shows that there's an electrical interconnection to the transistor. But if you look at Torgeson, if you look at the bottom of, for example, Column 5 going on to Column 6, every time Torgeson talks about these electrical connections, it's talking about metal wiring inside a metal layer, either the gold layer or the first metal layer, 111D or 111G. There's no disclosure anywhere in Torgeson of using polysilicon as wiring. And our patent in Column 3 explains that this was unconventional. Conventionally, you used metal because metal has lower resistance and metal improves timing. But our inventors realized that you could use polysilicon as a wiring, right, instead of metal, and that would allow you to simplify the chip. There's simply no discussion in Torgeson of using polysilicon as a conductor. There is the analysis of Dr. Pond, which the board credited, and he read Torgeson differently. He says what you call 85 actually is a polysilicon layer and goes all the way to 35 and touches it. Why is that not substantial evidence? Doctor, so the substantial evidence standard, it has to be legally sufficient substantial evidence, right? So we're in express disclosure, which under Hughes requires a clear and definite disclosure in the reference itself. So the expert can explain what the reference is disclosing. This expert says one of ordinary skilled in the art would expressly see it. Right. It would expressly know that to make this work, all of that has to be polysilicon. Right. And so, Your Honor, you said what he said, and that's exactly correct. He said skilled artisans would know that to make this work, it would have to be polysilicon. And that's very similar to the LBTIP case that's cited on page 12 of our reply brief. When the board chooses to proceed under an express disclosure theory, it cannot say that something is skilled artisans would look at it and know there's something in there that's not disclosed. That's inherency. And the board could have proceeded on inherency, but this court's standard for inherency is very high. Cannon doesn't defend the idea that you could sustain the board's decision on inherency. I don't think that's an inherency theory. Do you have another argument for why that's not substantial evidence? Yes. I think if you look just from the point of view of this court's rules in cases like Arendi and Google versus Intellectual Ventures, when expert testimony, when the board is permitted to credit expert testimony, and if you look at the board's, at what is the basis of Pond's testimony here, it's at appendix 837. He doesn't say, his reason for why this outline 85, which in figure six is clearly labeled the transistor, right, and not a polysilicon layer. His reasoning is, he's not pointing to a disclosure in Torgeson. He's not saying that there's some disclosure in Torgeson that this dashed outline is a polysilicon layer. At appendix 837, he says, well, there's three possibilities of where you could make this conductor, right? And then he purports to rule out two of the possibilities and includes that using polysilicon would be, quote, the only option. But Cannon admits now on appeal at appendix 33 that that's not the only possibility. You could make this connection through one of the metal layers. And so even just from the point of view of when you have conclusory expert testimony, that's not sufficient. Putting aside inherency, that's not sufficient to support a board decision, Cannon doesn't defend the only real rationale the board gave. Your time is running out, so why don't you, do you want to turn to, it's up to you. Do you want to turn to your Bruce Torgeson? Yes. I'll just very briefly talk about the motivation to combine argument. So I'd like to start with the board's interpretation of Intel. What Intel said is that skilled artisans, when you have a known solution, right, you have airbags, right? Skilled artisans would be motivated to put that known solution into similar devices, right? So skilled artisans would put airbags into different kinds of cars. But the requirement of Intel is that there has to be an analysis of what's similar, right? You wouldn't take, a skilled artisan wouldn't take a mid-engine layout from a Porsche and put it into a minivan, right? You still have to show that for the purposes of the invention of the combination that there is a similarity. And the board just didn't do that similarity analysis here. What similarity did it not do that it needed to have done? Yes. So our expert explained kind of uncontradicted at Appendix 973 that Bruce and Torgeson were very dissimilar. Bruce was for a design where the transistors were small and so you had a ground layer and there was a benefit to taking, the size of the chip was limited by the size of this ground layer. Because you have little transistors on top, you've got a big ground layer. And so there was a benefit to taking part of the ground layer and moving it up to the second layer so that you could minimize the size of the chip. But Torgeson, our expert explained at 973, has, as you can see in Figure 9 and Figure 6, has these huge areas for the transistors, right? Because what Torgeson is doing is allowing you to adjust the variability so it has to leave a lot of slack. And our expert explained that Torgeson is limited by the size of the transistor. So there's no benefit to taking part of the ground layer and moving it up top. But you're talking about bodily incorporation of this? No. I'm not understanding. There's no motivation to combine? I mean, there was a finite number of alternatives. And the other, probably, Bruce is one of them, one of two. And so there was sufficient motivation under, I think, our case law, including KSR. But KSR. There's a definite benefit to be wrong. Yeah. KSR and Intel, what they're very clear is that the inventions have to be similar enough where you would expect the benefit to translate from one to the other. And that wasn't the case here. And the board just didn't address that issue. OK. I'd like to reserve the rest of my time, please. Thank you. Thank you. Ms. Kuglemir, whenever you're ready. Thank you, Your Honor. And may it please the Court. I would like to focus on two mischaracterizations of the record that I heard today. First, Slingshot mischaracterizes our expert, Dr. Pond's, testimony about Torgerson. And second, Slingshot mischaracterizes the board's findings about the motivation to combine, which, as Your Honor noted, is one of two predictable solutions in view of market miniaturization and cost pressures. Substantial evidence supports both of these findings. I'm going to first address how Torgerson's polysilicon layer extends beyond the gate fingers and connects the power transistors to the logic circuits. And is that theory in your petition? So Your Honor, it is. It's in appendix page 73. I'll also note that it was raised in additional pages of the appendix. 73? 73, yes. You'll see on appendix page 73 the reference to the polysilicon layer. Where? Where on page 73? It's in the second paragraph towards the bottom. And? Connected. As seen in figure 9, what is the? Yeah, it's the line that says, and connected through a polysilicon conductor layer, EG. Not saying IE that it is, but the example of where the polysilicon is coming from is the polysilicon gate fingers as seen in figure 9. There are other places in the petition. What does it mean by EG, polysilicon fingers gates? So that's referencing the polysilicon fingers, which is undisputed that that's important. No, but I mean, what you just read, connected through the conductive layer, and then EG, isn't that meant to say, that is to say, the fingers? So I actually think the EG is important, because it's not a that is. It's the example, it's saying how we know it's polysilicon, because we know that the fingers are right there. And then if you go to figure 9, you see in the drawing that there's no differentiation between the fingers, and to the right of the drawing, what happens in figure 9. So that was how our expert interpreted it as the polysilicon continues beyond the gate fingers in the layer. But aren't the fingers supposed to end at the same place where the other structure is? The fingers end at that place, but the polysilicon layer continues. There are other places. So the reference to Exhibit 1007, paragraphs 85 to 96, is that Dr. Pond?  And does he, can you show us where in the appendix, if it exists, where he says something other than the fingers, where he says the polysilicon is a layer that goes beyond the  I think it's throughout his testimony, and he describes it. But this- Is it anywhere in what's cited in this part of your petition? These two paragraphs? Yes, I believe so. But I want to point out there's other pages in the petition that also make this argument. They're not in the joint appendix, because they didn't raise the forfeiture point until their reply. So they forfeited the forfeiture argument by not raising it until their reply. We would have put these pages in, and this was not only that, but it was addressed in the initial determination. The board was clear in instituting that it was instituting this inter partes review based on the question of whether there was a polysilicon layer extending beyond the gait fingers. And in the board's institution decision at pages 12 to 13, the board invited the parties to address this issue more during the trial. So what happened? The parties addressed this issue in detail during the trial. In the patent owner response, Slingshot addressed this argument. In the petitioner's reply, we responded. And then in the SIR reply, we addressed the argument. Not once did Slingshot say, wait a minute, this wasn't in the petition. So if they wanted to raise that issue, they should have raised it before the board so that the board could consider it. They didn't. And they didn't raise it in their opening brief to this court either. So it's been forfeited two times over. You were going to talk about Dr. Pond's testimony? Yes. So Torgerson, as we've discussed, discloses that there's polysilicon gait fingers. It also discusses, importantly, and I didn't hear reference to this testimony from opposing counsel, that the polysilicon gait fingers be interconnected. That's a reference from Torgerson that Dr. Pond relied on. He explained how interconnected means to a skilled artisan. Do you want to give us a page? Do you have a site? Yes. Torgerson's interconnected language is at appendix page 617 at columns 7, 39 to 40. And then the Dr. Pond testimony that follows is on appendix page 851. 851? 851, yes. And in that testimony, Dr. Pond explained how interconnected means to a skilled artisan that the polysilicon gaits are connected to each other via a polysilicon layer on each side. He came to that interpretation. They're on 851. 851? Yes, 851. Line? Line 20, about halfway down in bold, it says polysilicon gait fingers 91 that are interconnected at respective ends. So I realized it meant both ends. And then he goes on to explain how the interconnection works. It connects the fingers at the top. We go on to 852. So Dr. Pond continues to explain that he also referenced figure 9. And figure 9 doesn't show a break in the polysilicon. It shows that the polysilicon material continues all the way to the logic circuits. And that's what the board adopted as the expert testimony that it relied upon. And there's substantial evidence supporting that because we have Dr. Pond's testimony, but it's not just Ipsa Dixit. It's grounded in figure 9. And it's grounded in fact. Polysilicon, does it serve to disconnect, to provide the interconnection? I'm sorry. I'm sorry, Your Honor. Does the pink serve to provide the interconnection? How physically is it interconnected? Yes. The pink is the polysilicon layer. And it connects the logic circuits, which are the square. I believe they're colored in yellow on at least the version of the diagram. I can see how it connects to the square because it touches the yellow. But how does it serve to interconnect the respective ends of the gates? So I think it's helpful to actually look at a different... Can you just tell me how it does it? Oh, how it does it? It just... The layer just continues. There's a polysilicon layer on the chip. And it just continues on. So only between the source and the drain can the polysilicon work as a gate in the transistor. And then to the right, there's still polysilicon. It's just not working as a gate finger anymore. It's just to the right of it. The material is still there, the polysilicon layer on the chip. You want to address... Your friend spent some considerable amount of time talking about figure 6. Yes. Do you want to refer to that? Yes. So his interpretation of figure 6 is an interpretation. It's an attorney argument's interpretation of figure 6. It wasn't credited by the board. So what he's saying is basically, I offer a different perspective of the prior art, and your honors should disregard what the board thought of the prior art and the testimony that it relied upon, because my perspective is better. That's not the way that the substantial evidence... Well, he wasn't just saying his perspective. He was tying it to some language in the specification, right? He tied it to various language that referred to different layers and connections in the specification, but nothing was specific to that figure. It didn't tell us what was happening there. It didn't say it was polysilicon or anything else. He pointed to no evidence that would undercut the substantial evidence that the board credited. He did have an expert, I believe, and the board's opinion is admirably short, but I don't think it even ever grapples with their expert. Is that right? It doesn't mention the expert's testimony, but it cites portions of their patent owner's response that cite portions of the testimony. I know they were aware of it. I guess they didn't credit it, but can we be comfortable that they really gave it the type of analysis we're used to seeing more explicitly in board opinions? We can, because the board is clear about what evidence it's relying on, and it's clear on the basis of its findings. This court does not require the board to address every single argument and sub-argument and piece of expert testimony. It made it clear that the record was before it, what it looked at, and what it did not credit, which was the arguments that were supported by that expert testimony. This court has not required that the board's opinion be a perfect model of clarity. The important thing is that the path that it arrived at be reasonably discernible. That's from the Google case, and that's exactly what we have here. We know exactly what the court found, what the board found. It relied on Torgeson's interconnection language, Figure 9, and Dr. Pond's testimony, and that is substantial evidence, which should end this court's review. What's your response to this inherency argument? Why is what the board did not inherency in all but name? It's a complete red herring here. We didn't argue inherency. The board didn't address inherency. So the only issue that the court needs to think about right now is, does Torgeson make a clear and explicit disclosure? And from that, we again look at Figure 9. We again look at Torgeson's disclosure about the interconnection, and then Dr. Pond's testimony on how Skilled Artisan would review that evidence. He said it was explicit, and that was the testimony that the board credited. So it's either, for this court's purposes, it's either explicit or it's not. Inherency is just a distraction to the analysis because there's no inherency argument here. The inherency proceeds from Dr. Pond having said it was necessary, correct? Yeah, they seem to be making a mountain out of one word that he said during his testimony. Ordinarily, if someone says it's necessary, you think in terms of inherency, correct? But he clarified in his testimony that, and this is on appendix page 854, that his opinions are not based on inherency. He's interpreting Torgeson's design from the viewpoint of a skilled artisan. So they're making a lot out of the word necessary. Is that because he was saying, as a practical matter, there are only three ways to do it? So I think that was a mischaracterization that I heard from opposing counsel about his testimony. He started off with the premise that there are three layers that you could use, three different ways. He explained how the first layer has a large ground bus. It's a metal layer with a large ground bus. And he explained how, therefore, you would understand that that layer is out. And no one seems to dispute that. He looked at the second layer. That's the polysilicon layer. And he said, that's where the connection would have to be. Because the third layer, they really twisted his testimony here. They tried to get him to admit that it was possible. And the only thing that he admitted was, look, I'm an engineer. I'm never going to say anything's impossible. Perhaps, sometimes, some way, someone could figure out, theoretically, how to use that third metal layer. But a skilled artisan would not know how to do that. And Mr. Dietl, their expert, agreed. He had no understanding of how anyone would do that using that third layer. He had no understanding at all of how the interconnection came. And his testimony, Dr. Pond's testimony that I just referenced, is on appendix page 839. And on appendix page 836, that's the best admission they got out of him, which is simply that it literally didn't say the words that they were asking him about. So I think they're trying to really misconstrue his testimony and mischaracterize it to try to make it sound like he's making some speculative leaps, when his testimony has always plainly been, this is how a skilled artisan would view Torgerson. Before your time runs out, can you just briefly address this motivation to combine theory on Torgerson and Bruce? Yes, Your Honor. So the motivation to combine Bruce and Torgerson comes from the fact that Bruce teaches one of two predictable solutions. And skilled artisans would understand that a ground bus is needed, and the ground must be placed in one of the two metal layers. So there's no dispute that Bruce discloses the second option. That's not in Torgerson. So it's just a question of whether there were market forces, pressures, costs, reasons that you would want to make that change. Also note that Bruce and Torgerson are analogous arts. They share many common inventors from HP. And so this is a classic example where there's- Is that your argument? I thought before he got to the details, he was saying the two references are not similar enough. He said they're not similar enough, really trying to- Well, what's your response to that? They're from the exact same art with the same inventors trying to address similar problems. The only difference is that one puts the ground bus on top and the other one on the bottom. But Dr. Pond explained why a skilled artisan would have a desire for miniaturization, why a skilled artisan would want to either increase the functionality of the chip or reduce the cost by making it smaller. And then he would be motivated to use some extra space in Torgerson on that top layer that's empty and move the ground bus up. He explained why that would work. And he explained why that would be a motivating factor. Either by moving it up, you would get a better functioning Torgerson chip, or if Torgerson's ground bus is already sufficient the way it is, you're actually able to make your chip smaller. And that's credited expert testimony from the board. Does the court have any more questions? So I'll just conclude briefly by taking a step back. You can't retry an IPR on appeal. And it seems very clear that that's what they're trying to do here. They've got new counsel who's come up with new arguments that just weren't raised properly before the board. And they've raised forfeited arguments. They're trying to misconstrue testimony. And that's just not appropriate under the substantial evidence standard. So the decision below should be affirmed as supported by substantial evidence. Thank you. Thank you. I'd like to start with the expert testimony, because the only expert testimony that the board really purported to credit, and this is at appendix 13, it says, quote, Dr. Pond explained that, quote, as a practical matter, a skilled artisan would understand that it's necessary that Torgerson's polysilicon gate fingers 91 extend to the logic circuits. It didn't quote any of the other testimony that my colleague referenced. It quoted specifically that was the portion of the testimony that the board found persuasive. And that is Dr. Pond's inherency theory. And if the court would please turn to. How could we say it's inherency when he says it's not inherency? And he's just reading what we're telling us how one is skilled in the art would read the prior reference. So there's two points. One is the LBTIP is very clear, right? You don't have to take the. Are you familiar with our memory web decision from December? We expressly distinguish. It's non-prank. So I'm not familiar with that case. I'm happy to submit something on it. But putting aside the inherency point, if you look at the Dr. Pond's testimony at 837, which my colleague referred to. So it actually, he says what he means, right? At 837, line 8, he's asked, what leads you to the conclusion that there is a polysilicon conductor disclosed in Torgeson? And he doesn't, he says, you know, he shows us his designs in figure six and nine, right? But he doesn't say, here is a disclosure of where there is a polysilicon conductor in addition to the gate fingers. He goes through this analysis on this page and says, well, there's these three metal layers. And you couldn't use this one. You couldn't use that one. You couldn't use this other one. And then gets to, at appendix 838 at the end, that this was the only option was to use the polysilicon. But he admits, if you go down at the bottom, he walks that back, right? On line 22, he says, well, you know, it's not impossible that you could use one of the other layers. But it's unlikely, right? So there's no clear, Hughes requires a clear disclosure in Torgeson. And all you have is an expert saying, well, it's unlikely that it was not polysilicon. I want to address the interconnected language. Torgeson, at column 7, it has this paragraph, lines 32 through 40, says that the source, drain, and gates are, quote, electrically interconnected, right? It says the source and drain are electrically interconnected. And then it says the gate is also interconnected. That's talking about the fact that it's a circuit, right? It is electrically interconnected to other things. But the only place Torgeson ever talks about polysilicon wiring is, sorry, Torgeson never talks about polysilicon wiring. Whenever it says electrical interconnections, for example, at the bottom of column 5, it's talking about metal wiring. Time's up. Thank you. Thank you. Thank you. Thank both sides. The case is submitted.